# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| LINO SUAREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 05 C 6401 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| JOANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Congress's carefully crafted system for judicial review of decisions by the Social Security Administration necessarily reposes substantial discretion in Administrative Law Judges to make the threshold determination of witness credibility and issues of fact and application of law to fact. *Cf. Sarchet v. Chater*, 78 F.3d 305, 308-309 (7th Cir.1996).[1] In reviewing the decision of an Administrative Law Judge in granting or denying social security benefits, the question is always whether the decision of the ALJ is supported by substantial evidence. If it is, the findings of the ALJ are "conclusive," and the decision

---

[1] According to the Social Security Administration's data on Disability Determination and Appeals for fiscal 2005, there were approximately 2,570,831 initial claims and 1,518,235 continuing disability reviews. Of the initial claims, ALJ's reviewed approximately 509,390 and granted benefits in approximately 62% of the cases, while dismissing 13% and denying benefits in 24%. The Appeals Council reviewed 89,499 new applications and granted benefits in an additional 2% of the cases, but remanded 25%, and denied benefits in 74%. The remaining 2% were dismissed. Of the 4,000,000 initial applications and continuing disability reviews done by the Social Security Administration in fiscal 2005 federal courts saw 12,360 cases or 0.3%. Of this number, there was a remand in 45% of the cases, a denial in 42% of the cases, allowance in 5%, and a dismissal in 8%.

must be affirmed. 42 U.S.C. §405(g). A court cannot reweigh the evidence or substitute its judgment for that of the Social Security Administration. *White v. Barnhart*, 415 F.3d 654 (7th Cir.2005). But deference is not obeisance. In order for the court to affirm an ALJ's denial of benefits, the ALJ must have articulated the reasons for his decision and clearly expressed the reasoning process that led from the evidence to the ultimate conclusion. *Dixon v. Massanari*, 270 F.2d 1171, 1176 (7th Cir. 2001).

In the instant case, the ALJ did precisely what the law mandated he do: he reviewed and analyzed the medical evidence in the case--that which favored Mr. Suarez as well as that which did not, *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994) – and he carefully explained the reasoning that underlay his conclusions.[2] The same care and balance exhibited by the ALJ in evaluating the medical (and other) evidence was exercised by him in evaluating Mr. Suarez's credibility. The record in this case is more than adequate to allow a reviewing court to assess the overall validity of the ALJ's findings and the logical connection between the evidence and his conclusions and to afford the plaintiff a meaningful judicial review.

This case presents two issues: First, whether the ALJ's determination that Mr. Suarez's claim of debilitating pain in his left hand was not credible was "patently

---

[2] There were no illogical conclusions like those that have occurred in some cases. For example in *Sarchet*, the comments of the ALJ demonstrated a significant misunderstanding of the plaintiff's disease, a shaky understanding of the medical facts, a significant misapprehension of the claimant's testimony which led to a flawed assessment of her credibility, and a number of unfounded sociological speculations, which led the ALJ to conclude that Ms. Sarchet's lack of work history necessarily stemmed from a lack of interest in employment rather than from her many medical ailments that were "[i]gnored" by the ALJ. 78 F.3d at 306-07.

2

wrong." [3] Second, is there substantial evidence to support the administrative law judge's conclusion that Mr. Suarez was not entitled to Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2); 1382c(a)(3), where the evidence showed only that Mr. Suarez suffered from diet-controlled diabetes and had lost a small portion of the tip of a finger of his left hand – Mr. Suarez is right handed – and possibly from headaches that were "relieved" by Tylenol?

## I.
## PROCEDURAL HISTORY

Mr. Suarez applied for Disability Insurance Benefits and Supplemental Security Income payments on June 7, 2003 – with a protective filing date of May 9, 2003 for SSI purposes – alleging that he had been disabled since May 9, 2002, due to pain in his left hand, hearing loss, severe headaches, dizziness, and forgetfulness. (Administrative Record ("R.") at 85-87, 90, 15-152). His application was denied at both the initial level of administrative review (R. 13, 45-50), and upon reconsideration. (R. 51-53). Mr. Suarez continued pursuit of his claim by filing a timely request for hearing on October 31, 2003. (R. 13, 57). On June 22, 2005, an administrative law judge ("ALJ") conducted a hearing at which Mr. Suarez, who was represented by counsel, testified. (R.18-43A). In addition, Dr. Julian Freeman testified as a medical expert, and James Radke testified as a vocational expert. (R. 18, 31-37, 37-41).

---

[3] Mr. Suarez also claimed he had severe headaches, dizziness, and was sometimes forgetful. (R. 110).

In a decision dated July 27, 2005, the ALJ found that Mr. Suarez was not disabled because he retained the ability to perform his past relevant work as a machine operator. (R.13-16A). This became the final decision of the Commissioner when the Appeals Council denied Mr. Suarez's request for review of the decision on September 23, 2005. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Suarez has appealed that decision under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE AT THE HEARING

Mr. Suarez was born in Mexico on September 23, 1944, making him sixty years old at the time of the ALJ's decision. (R. 21, 85, 151). He is 5' 7" and weighs 145 pounds. (R. 22). At the hearing, he testified that he got a sixth-grade education in Mexico, and that he came to the United States in 1971 and is a naturalized United States citizen. (R. 32). He said that he speaks, reads, and understands very little English, and has never taken any English lessons, with the possible exception of a few in connection with his citizenship application. (R. 23-24).[4] Thus, he testified through a Spanish language interpreter. (R. 18-43A).

Mr. Suarez's work history included jobs as a machine operator with five different employers from September 1984 until July 12, 2001. Each employer trained him between one and four weeks for the machine he would operate. (R. 25-29). From September

---

[4] During the hearing, there was some question as to Mr. Suarez's command of English. Early in the proceedings, he was able to understand the ALJ – without translation – when he asked him to move a Kleenex box away from the microphone. (R. 24). When the ALJ asked him about this, Mr. Suarez responded, "That's what I could understand, and at that moment, but suddenly I don't understand anything." (R. 24.) The ALJ did not pursue the issue any further.

1984 through January 1991, Mr. Suarez operated a paper cutter, but quit because "they wouldn't give enough [money] for all of us." (R. 25-26). To perform this work, Mr. Suarez had to lift boxes of paper weighing up to 40 pounds. (R. 25). After that, Mr. Suarez began work operating a metal folding machine at a cabinet-making company. (R. 26, 101). He then worked from April 1995 through September 1997 at another paper company where he operated a folding machine (R. 27, 101), followed by a two-year stint with an auto parts manufacture, operating a machine that made brake shoes. (R. 27-28, 101). These three jobs involved no lifting. (R. 27-28).

Finally, Mr. Suarez worked at a steel processing company, where he operated a metal folding machine from May of 1999, through July of 2001. (R. 28, 101). The job required him to lift metal parts weighing 20 to 25 pounds. (R. 29). He was laid off from this last job along with forty to fifty others. He testified that, had he not been laid off, he would still be working there today. (R. 29).[5] On the other hand, in one of the forms Mr. Suarez completed in connection with his applications, he claimed that he missed a lot of days of work due to severe headaches. (R. 90).

In connection with his application for DIB and SSI, Mr. Suarez, with the help of his daughter, completed questionnaires on his daily activities and the manner in which his claimed impairments affected him. (R. 109-115). Mr. Suarez said that he did household chores such as cleaning, vacuuming, and dusting every day, and chores like

---

[5] Counsel for the claimant then asked Mr. Suarez, "So in other words, you're not disabled?" (R. 30). To which Mr. Suarez replied, "No, I fractured both of my fingers of the left hand, and I fractured them in that company." (R. 30).

laundry and repairs as needed. (R. 109). He stated that his left hand had become weak, and that it limited his ability to grasp and hold objects, use kitchen utensils, button a shirt, and tie shoes. (R. 109, 113). He still was able to work on his car, but tasks would take longer than they had before he injured his hand. (R. 115). He related that he felt pain when holding things with his left hand and when he reached overhead, he felt pain throughout his left arm. (R. 109, 113). He had no problems driving a car, using public transportation, or climbing stairs. (R. 114). Overall, he said his impairments had not really affected the majority of his daily activities. (R. 111).

Mr. Suarez explained that he had to take Advil or Ibuprofen for the pain in his left hand in order to get a restful night's sleep. Mr. Suarez claimed to experience problems concentrating and finishing things. He also said he was forgetful and sometimes misplaced things. (R.109-110).

## A.

### The Medical Evidence

Mr. Suarez contends that he is disabled as a result of pain in his left hand, hearing loss, severe headaches, dizziness, and forgetfulness. There is a paucity of medical evidence, however, relating to these complaints, and they were not debilitating in any event. Mr. Suarez – who is right-handed – related that he lost the tip of his left index finger in 1999 and fractured his left thumb in 2000 in the course of his work for his last employer. (R. 29-31, 135, 138). The Administrative Record contains no documentation of these injuries, even though Mr. Suarez testified that the company sent him to Mercy Hospital following the fracture. (R. 30). He was able to return to work following

6

recovery from these injuries on both occasions, although he claimed he could no longer bend his thumb as well as before, and experienced pain in the joint. (R 31).

Dr. M.S. Patil performed a consultative examination on July 29, 2003, at the request of the Bureau of Disability Determination Service. Mr. Suarez related that he had suffered from non-specific headaches for many years, about three times a week for 8-10 hours. He said, however, that the headaches were relieved when he took Advil or Tylenol. He also complained of a mild hearing loss in his left ear, accompanied by mild tinnitus and forgetfulness. Mr. Suarez also indicated that, as a result of lacerating his left index finger and fracturing his left thumb, he experienced pain and mild numbness, as well as some difficulty opening jars, pulling, carrying, and holding. (R. 135-136).

However, testing of Mr. Suarez's fine and gross manipulation revealed no difficulty, with either hand, in opening doorknobs; squeezing a blood pressure cuff; picking up coins, a pen, and a cup; buttoning his shirt, pulling his zipper, tying shoelaces, writing his name, or turning pages. (R. 138). He demonstrated a normal grip strength of 5/5 in both hands and retained normal hand dexterity. (R. 138). General neurological examination was normal. (R. 138). Coordination was intact and cerebral functions were normal. (R. 137). There was a small tympanic perforation in the left ear, and Mr. Suarez exhibited mild difficulty hearing with that ear, but could understand conversational speech from a distance of six feet. (R. 136, 138). He does not wear a hearing aid. (R. 136).

With just that report in hand in support of Mr. Suarez's applications, the state agency contacted Mr. Suarez's attorney on October 8, 2003, to ask whether there wasn't

some other medical evidence or record of treatment. (R. 124). Mr. Suarez's attorney, who is his present counsel, evidently responded that there were no other medical records and that the decision in Mr. Suarez's case should be made on the basis of the file as it stood. (R. 124). No explanation was given for the absence of records of Mercy Hospital that would have confirmed Mr. Suarez's claim of injury to his thumb.

For nearly two years following that consultative examination, there is no record of Mr. Suarez seeking medical treatment of any kind. Then, on February 4, 2005, Mr. Suarez went to see Dr. Roland Lara with complaints of a cough and pain in his chest. (R. 140). Dr. Lara saw Mr. Suarez on three occasions. Most of Dr. Lara's notes are illegible. (R. 140-143). Indeed, all that Mr. Suarez's counsel is able to glean from the jottings is that Mr. Suarez's glucose level was elevated (as high as 176), although he is unable to refer to a page. (*Memorandum in Support of Plaintiff's Motion*, at 2-3)("*Memorandum*"). Dr. Lara also indicated that there was no neuropathy and that Mr. Suarez's diabetes was controlled by diet. (R. 142, 145, *see also*148 (Eye care center report)).

On April 1, 2005, Dr. Lara reported that Mr. Suarez wanted "a form filled (re: [illegible] fingers) *I did not trust him. . . .*" (R. 143)(Emphasis supplied). The doctor did not provide any form, which was presumably some sort of disability report. Dr. Lara's notes and Dr. Patil's report constitute the entire medical record in this case.

## B.
## Medical Expert Testimony

Dr. Julian Freeman testified as a medical expert at Mr. Suarez's administrative hearing. Dr. Freeman found tests from 2005 indicative of diabetes under moderate

control. He further noted the 2003 consultative exam which stated that the tip of the left index finger was absent, but thought that it may have been just scarred from repair and not totally absent. In either case, Dr. Freeman found soft tissue damage to the left index finger tip. He also noted that there was no medical evidence to demonstrate that Mr. Suarez had fractured his left thumb. There was also no evidence supporting Mr. Suarez's allegations of memory loss or diminished mental functioning. (R.32-33).

Dr. Freeman acknowledged that the record indicated Mr. Suarez experienced some hearing problems in his left ear. (R. 33-34). "[I]n my first glance I thought [the physician] was just simply saying the person could hear adequately in both ears. ... But that specific frequencies are stated implies that there might have been a more extensive exam." (R. 33). Dr. Freeman did not ultimately determine the extensiveness of this exam, but did note that Mr. Suarez reported tinnitus, which is a steady ringing sound, in his left ear. (R. 34). Dr. Freeman concluded that the exam noted no hearing impairment. The ALJ, however, was sufficiently aware of the medical records that he pointed out to Dr. Freeman that the consultative exam in fact noted that "[t]here was mild difficulty of hearing from the left ear." (R. 34). Dr. Freeman conceded that this statement suggested some impairment, but that the actual results of the hearing test counseled against such finding. This line of questioning ended with Dr. Freeman unsure how to interpret the hearing test portion of the consultative exam. (R. 34).

As for the severity of Mr. Suarez's alleged impairments, Dr. Freeman stated the amputation of the tip of a finger on Mr. Suarez's left hand – alone or in combination – is insufficient to equal the relevant listing. (R. 34). The sensory loss in the finger did not

9

impose a limitation of bimanual dexterity comparable to that outlined in relevant listing, and the hearing loss, to the extent it can be defined from the exam, is far less severe than what is required to meet the listing. (R. 34-35.) Dr. Freeman felt none of Mr. Suarez's impairments, either alone or in combination, met or equaled a listed impairment. "Regarding mental impairment," he explained, "an impairment of mental function [,] the clinical exams to the extent that is reported, does not indicate any limitation of intellectual function." (R. 35).

Dr. Freeman did opine, however, that Mr. Suarez "probably does" have a severe impairment under the SSA's use of the term, which means conditions that impose more than minimal limitations on the individual's ability to work. (R. 35). Dr. Freeman identified these impairments: elevated levels of glucose and glycohemoglobin, noted in 2005, likely limited him to lifting and carrying only 25 pounds and occasionally 50 pounds. Similarly, Mr. Suarez could not climb more than two flights of stairs in light of his diet-controlled diabetes. The injury to his left index finger affected his ability to work by limiting precise feeling and fingering; testing might reveal the finger injury as hindering his ability to feel textures, shapes, sharpness, dullness, and temperature of objects with his left index finger. Finally, Mr. Suarez's hearing loss, if legitimate, prevented exact localization of sounds occurring around him. But despite these impairments, Dr. Freeman found no interference with the claimant's ability to sit, walk, or stand for eight hours a day. (R. 35-36).

Counsel for Mr. Suarez presented Dr. Freeman with Mr. Suarez's form regarding his daily activities, and highlighted the sections describing his client's problems using his

10

left hand for activities related to feeding and dressing. (R. 36). When asked if these allegations were consistent with his opinion, Dr. Freeman described them as "potentially consistent" because they "could reflect post traumatic arthritis after a thumb fracture." (R. 37).

## C.
## The Testimony Of The Vocational Expert

James Radke then testified as the vocational expert. Relying on Mr. Suarez's description of his work, Mr. Radke labeled all five of his positions as unskilled machine operator jobs. The first job—the paper cutting job—was performed at a medium exertional level. Mr. Suarez's work as a folding machine operator at the second and third jobs qualified as light work. His employment with the auto parts manufacturer was also light. Mr. Suarez's last machine operator position was considered medium work. (R. 38).

The ALJ then asked Mr. Radke to apply the functional limitations described previously by Dr. Freeman to the base of light to medium, unskilled jobs available. There were a few medium, unskilled jobs that required precise sensation of the index finder and thumb on both hands, and Mr. Radke expected that Mr. Suarez would be unable to perform those. But as to all medium, unskilled jobs, he thought the erosion of the job base available to Mr.Suarez would be insubstantial. Mr. Radke estimated 95 percent of medium, unskilled jobs would still be available to Mr. Suarez. (R. 39). The ALJ described for Mr. Radke a hypothetical worker with all of Mr. Suarez's limitations[6]

_____

[6] The ALJ posited an individual 60 years of age; who understands little English; has an unskilled work history, who suffers from diabetes, a lacerated left index finger, and mild hearing loss; who complains of forgetfulness; who can lift up to 50 pounds occasionally and 25 pounds frequently; who can sit, stand, and walk for eight hours a day; and who was limited in the ability to feel with the
(continued...)

and asked if that hypothetical worker could return to Mr. Suarez's past relevant work. (R. 40-41). Mr. Radke testified that such a worker could return to those jobs. (R. 41).

For the sake of clarification and the benefit of the vocational expert, the ALJ asked Mr. Suarez to describe how he operated the machine for one cycle to ascertain the use of both his hands in his past relevant work. After he closed the machine, Mr. Suarez stated, it worked for three to four minutes, during which he sharpened the screws while the machine churned. While testifying, Mr. Suarez pantomimed with his *right hand—his dominant, non-injured* hand—as if operating the machine while he explained his duties. This prompted the ALJ to ask if the work involved only his right hand, to which Mr. Suarez responded: "The left one." (R. 42).

### III.
### THE ALJ'S DECISION

The ALJ found that Mr. Suarez had not engaged in substantial gainful activity since 2001, when he alleges he became disabled. (R. 14, 16). He determined that Mr. Suarez had the following impairments: diabetes mellitus (controlled by diet), amputated left index fingertip, and mild left ear hearing loss. (R. 14, 17). These impairments, according to the ALJ, met the Agency's requirement that a severe impairment significantly limit the ability to perform basic work activities. (*Id.*). *See* 20 C.F.R. §§ 404.1520(c); 416.920(c). The ALJ found no evidence of a medically determinable mental impairment, left thumb fracture, headaches, or dizziness.

---

[6](...continued)
injured finger and localize sound. (R. 39-40).

He noted the record demonstrated that Mr. Suarez displayed normal attention, concentration, and affect, that neurological signs were normal, and that he exhibited normal flexibility in all joints. (R. 14). The ALJ further determined that none of Mr. Suarez's impairments, either singly or in combination, met or equaled an impairment listed in the Agency's regulations as disabling. (R. 14, 17). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing of Impairments.

The ALJ then assessed plaintiff's residual functional capacity ("RFC"). In so doing, the ALJ reviewed the medical evidence, which was sparse at best. He noted that while Mr. Suarez was diagnosed with diabetes in 2005, the condition was controlled by diet and is asymptomatic. The ALJ also noted that Mr. Suarez was right-handed, and that despite the loss of the tip of his left index finger, testing revealed normal grip strength and dexterity with the ability to perform everyday tasks with his hands. Finally, the ALJ acknowledged that Mr. Suarez had mild hearing loss in his left ear, but could hear normal conversation at a six-foot distance. (R. 15). As a result, the ALJ determined that "the claimant's medically determinable impairments preclude the following work-related activities: lifting more than 50 pounds occasionally or more than 25 pounds frequently; and he has limited finger ability to feel precisely and limited ability for precise localization of sound." (R. 14). This is essentially an RFC for medium work. 20 C.F.R. §§404.1567(c); 416.967(c).

Recognizing that findings on credibility cannot be based "on an intangible or intuitive notion about an individual's credibility," but must be "grounded in the evidence and articulated in the determination or decisions," SSR 96-7p, the ALJ reviewed the

13

evidence and the factors of 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3) and concluded that Mr. Suarez's allegations of disabling symptoms and limitations were not credible. (R. 15). The ALJ found that Mr. Suarez's daily activities were "not limited to the extent one would expect, given the assertions of disability." (R. 15). The ALJ listed examples lifted from the Daily Activities Questionnaire (R. 109), in which the claimant acknowledged cleaning, vacuuming, dusting, and shopping for groceries. (R. 15). In that report Mr. Suarez described running errands, leaving the house, using public transportation, watching the children, working on his car, and making repairs around the house. (R. 15, 109-115). The ALJ concluded that "[t]hese are not the daily activities normally reported by those asserting disability." (R. 15).

In addition, the ALJ noted the virtual absence of supporting medical evidence for certain of the claims by Mr. Suarez and the very significant fact that Mr. Suarez either did not seek treatment for these conditions even though Mr. Suarez asserted that his disability began on May 9, 2003. It was not until February 2005 that he saw a doctor and then only for a chest cold. (R. 15). The ALJ also found Mr. Suarez's limited use of medications—ibuprofen for his hand pain--and diet alone to control his diabetes not suggestive of a more limiting impairment. (R. 15).

Given the willingness of treating physicians often to "bend over backwards to assist a patient in obtaining benefits," *Hofslien v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir. 2006)(Posner, J.); *see also Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001), Dr. Lara's unwillingness to provide a disability form was also significant. Indeed, Dr. Lara

apparently found the encounter with Mr. Suarez so troubling that he noted that he "did not trust" Mr. Suarez. (R.16).

In considering Dr. Freeman's testimony, the ALJ noted that he had opined that Mr. Suarez had the following limitations: "lifting more than 50 pounds occasionally or more than 25 pounds frequently ... limited left finger ability to feel precisely and limited ability for precise localization of sounds." (R. 16). The ALJ found this assessment reasonable in light of the record (R. 16).

Given Mr. Suarez's residual functional capacity, the ALJ next evaluated his ability to perform any past relevant work. (R. 16). The VE, Mr. Radke, testified to two different categories of past relevant work among his five past positions: machine operator, medium, unskilled and machine operator, light, unskilled. (R. 16, 38.) The ALJ noted Mr. Radke's assessment that the claimant's limitations eroded only 5 percent of the occupational base, leaving 95 percent of the particular occupational base available to Mr. Suarez. (R. 16). The ALJ also related Mr. Suarez's description of how he operated his machines. (R. 16). Considering the VE's testimony that a hypothetical individual with Mr. Suarez's limitations could perform Mr. Suarez's past machine operator work, the ALJ concluded that Mr. Suarez retained the capacity to perform his past relevant work. (R. 16). Accordingly, the ALJ found that Mr. Suarez was not disabled and was not entitled to DIB or SSI under the Act. (R. 16-16A).

# IV.
# DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Binion*, 108 F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for his decision at "some minimum level." *Dixon*, 270 F.3d at 1176. This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id. See also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir.

2004) [7] Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

## B.
## The Required Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

---

[7] The requirement that Administrative Law Judges must explain the reasoning that led to a particular conclusion is neither unique to ALJs nor does it impose some heightened obligation on them. The principle governs decision-making at all levels of the federal judiciary as well. *See, e.g., United States v. Elliott*, 467 F.3d 688, 690 (7th Cir. 2006); *Szmaj v. AT&T*, 291 F.3d 955, 956 (7th Cir. 2002)(Posner, J.)(Referring to a particular case as weak authority "because there is no discussion of the point, only a conclusion."); *United States v. Eiselt*, 988 F.2d 677, 680 (7th Cir. 1993) ("'Reasons' means something more than conclusions – a distinction important not only to the defendant... but also to the appellate process."). *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171 (1951)(Frankfurter, J., concurring)(the validity and moral authority of any conclusion largely depends on the mode by which it was reached); Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959)( "In the end, however, *ipse dixits* are futile as instruments for the exercise of 'the judicial Power of the United States.'" ).

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Mr. Suarez advances two arguments for the reversal of the ALJ's decision. First, the ALJ failed to make a proper credibility finding by failing to follow SSR 96-7p, as he was required to do. (*Memorandum*, at 5-7). Second, the ALJ's conclusion that he was capable of returning to his past relevant work as a machine operator is not supported by substantial evidence. Neither argument is persuasive

## 1.
## The ALJ Made A Properly Supported Credibility Finding

Whether to have credited Mr. Suarez's complaints of headaches, dizziness and pain was a function of his credibility. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006)(Posner, J.). A reviewing court must afford an ALJ's credibility finding "considerable deference" and can overturn it only if "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *Schmidt v. Barnhart*, 395 F.3d 737, 746-47

(7th Cir. 2005); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)(citations omitted). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims,* 442 F.3d at 538.

"[O]f course, the Administrative law judge did not have to believe" Mr. Suarez. *Sarchet*, 78 F.3d at 307. *Accord Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir.2006). He was entitled--indeed he was obligated--to determine the validity of Mr. Suarez's testimony. But, making judgments about who is telling the truth is a tricky business. The reviewing court lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and lacks the specialized tribunal's experience with the type of case under review. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J., dissenting) ("a few minutes observation of the parties in the courtroom is more informing than reams of cold record."). That is why appellate review of credibility determinations, especially when made by specialists such as the administrative law judges of the Social Security Administration, is entitled to "special deference." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).

Judges often overestimate their ability to sift true from false testimony by assessing demeanor, "which is a form of lie detector without the electrodes and graph paper." *Djedovic v. Gonzales*, 441 F.3d 547, 551 (7th Cir.2006). Judge Posner has cautioned that it is extremely difficult to determine whether a witness is testifying truthfully, and, much pious lore to the contrary notwithstanding, demeanor is often an

unreliable guide to truthfulness. *See Consolidation Services v. KeyBank National Association*, 185 F.3d 817, 820 (7th Cir.1999); *United States v. Wells*, 154 F.3d 412, 414 (7th Cir.1998); *Carradine*, 360 F.3d at 751. Nonetheless, demeanor continues to be thought a significant component of credibility determinations. *Cf. Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir.2005), *cert. denied*, --- U.S. ----, 126 S.Ct. 2862 (2006); *United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir.1982) (en banc )(ability of judge to observe demeanor of jurors). Indeed, the Supreme Court has said that the demeanor of a witness may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story, "for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985); *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir.2001)("completely proper in making credibility determinations" in social security case for ALJ to rely on claimant's demeanor).

Perhaps the ALJ in this case was sensitive to the inherent difficulty in making credibility judgments based solely on demeanor, especially given the difficulties posed by the fact that Mr. Suarez testified through an interpreter. Whatever the reason, the ALJ chose not to decide the case on demeanor, but rather to follow the most responsible of courses and to review the entire record as SSR 96-7p required. That regulation counsels ALJs to look to extrinsic documents in making credibility determinations. That regulation is consistent with the Seventh Circuit's recognition that credibility involves

more than demeanor, *Indiana Metal Products v. NLRB*, 442 F.2d 46 (7th Cir.1971), and that documents or objective evidence may contradict the witness' story, or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. *See Pinpoint Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.) (sitting by designation).[8]

It is an ALJ's basic obligation to scrupulously and conscientiously explore all relevant facts that bear on the claimant's capacity to work or his entitlement to benefits. *Cf. Heckler v. Campbell*, 461 U.S. 458 (1983); *Johnson v. Barnhart*, 449 F.3d 804 (7th Cir.2006); *Madrid v. Barnhart*, 447 F.3d 788 (10th Cir.2006). That is precisely what the ALJ in this case did. SSR 96-7p instructs ALJs to "compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the 'other sources' defined in 20 CFR 404.1513(e) and 416.913(e)." *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000).

The ruling instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by

---

[8] Indeed, where such factors are present, a court of appeals can find clear error in a finding of credibility based on demeanor, even though such determinations are, as a matter of practice, usually insulated from appellate review. *Ginsu Products, Inc. v. Dart Industries, Inc.*, 786 F.2d 260, 263 (7th Cir.1986).

21

the evidence in the case record." SSR-96-7p; *Prochawska*, 454 F.3d at 738. And, it requires an ALJ to consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). SSR 96-7p; *Prochawska*, 454 F.3d at 738; *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004).

After a review of the ALJ's credibility determination in light of these requirements, it cannot be said that the ALJ's determination was "patently wrong."

The salient characteristic of this record is the dearth of objective medical evidence supporting Mr. Suarez's claims. He bore the burden of supplying adequate records and evidence to prove his claim of disability. *See* 20 C.F.R. §§404.1512(c); 416.912(c). After all, "who is in a better position to provide information about his own medical condition...." *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). *See also Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Mr. Suarez failed to support his claim, and that lack of evidence factored into the ALJ's credibility determination – and rightly so.

Mr. Suarez claims he became disabled in May of 2002, but the record includes no medical evidence from that period to support his claim that he fractured his thumb or that he was treated at Mercy Hospital. When asked about the absence of documentary support, Mr. Suarez's present counsel told the ALJ the record was complete. His alleged onset of disability coincides with the date he was laid off from his last job – a job he was able to perform despite the claimed injuries to his left hand. Indeed, he said but for the layoff, he would still be there. Mr. Suarez's only visits to doctors came in July of 2003 –

22

a consultative examination arranged by the Agency (R.135) – and February-April of 2005 – three visits to Dr. Lara occasioned by a bad chest cold. (R.139, *et. seq.*).

The objective medical evidence associated with these few visits demonstrated that Mr. Suarez has asymptomatic diabetes (controlled by diet alone),[9] a missing tip of the index finger of his non-dominant, left hand, and some minor hearing loss in his left ear. Mr. Suarez exhibited no neurological deficits, no loss of grip strength or dexterity in either hand, and he was able to understand conversation at a distance of six feet. There was no objective medical evidence of headaches, dizziness, or the claimed thumb fracture. [10]

While an ALJ may not ignore subjective complaints of pain solely because they are unsupported by medical evidence, *Schmidt v. Barnhart,* 395 F.3d 737, 746-47 (7th Cir.2005), he is not obligated to accept those complaints at face value. Quite the contrary. He is to consider the entire record in order to evaluate what weight to accord them. Indeed, as Judge Posner, the author of *Schmidt,* has stressed, despite the inherent difficulty of evaluating testimony about pain, an ALJ will often have solid grounds for disbelieving even a claimant who testifies he has continuous, agonizing pain. *Johnson,*

---

[9] Mr. Suarez suffers from Type 2 diabetes or what is often referred to non-insulin dependent or adult-onset diabetes. Type 2 diabetes counts for about 90-95% of the 14.6 million diagnosed cases of diabetes in this country. Only about 15% of these cases are controllable without some medication whether oral medication, insulin or a combination of both. The Center for Disease Control estimates that approximately 20.8 million people or 7% of the population have diabetes. Of this number, it is estimated that 6.2 million have the disease but do not know it. *See* www.CDC.gov/diabetes.

[10] Mr. Suarez's claim that Dr. Patil "diagnosed" him with chronic headaches and forgetfulness (*Memorandum,* at 2) is untrue. Dr. Patil made no such diagnosis; he merely noted Mr. Suarez's complaints of headaches and forgetfulness. Indeed, he said that "[n]eurological examination is essentially negative . . . Mentation and speech are normal. History is negative for head trauma, seizure activity or neurosurgery." (R. 138).

449 F.3d at 806. Numerous cases have confirmed that ALJs can properly reject unsupported claims of pain. *See, e.g., Cunningham v. Barnhart*, 440 F.3d 862, 864 (7th Cir. 2006); *White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005); *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006).

Among the factors to be considered in evaluating claims of pain are the absence of corroborating, objective medical evidence and the degree of pain complained of. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir.2005)(complaints of extreme pain were inconsistent with the findings of all the doctors who examined claimant and opined that she had only minimal or moderate limitations). Here, the ALJ properly determined that the objective medical evidence did not support Mr. Suarez's complaints of disabling pain from his left hand or headaches. Even when he was seen by Dr. Patil in July 2003, Mr. Suarez said that his headaches "are relieved when he takes Advil or Tylenol." (R. 135). And, in 2005, when he did see a doctor, it was because of a chest cold. *See* SSR 96-7p; *Prochawska*, 454 F.3d at 738; *Schmidt*, 395 F.3d at 747 (in finding claimant not credible, ALJ properly considered claimant's failure to seek treatment or therapy for his conditions, as well as fact that claimant was not using any prescription medication); *Sienkiewicz*, 409 F.3d at 804 (plaintiff never sought treatment for headaches, despite complaints about their severity).[11]

---

[11] The inconsistency between Mr. Suarez's claimed pain and his failure to have sought medical care fits within the general evidentiary principle that prior conduct inconsistent with testimony is admissible for impeachment. *See Seventh Circuit Pattern Jury Instructions, 1.14; Molnar v. Booth*, 229 F.3d 593, 604 (7th Cir. 2000). *Compare United States v. Schaefer*, 291 F.3d 932, 941 (7th Cir. 2002)(conduct inconsistent with acceptance of responsibility under the sentencing guidelines).

24

The ALJ also considered Mr. Suarez's description of his daily activities as he should have. *See Heckler v. Campbell*, 461 U.S. 458, 475 (1983)(Brennan, J., concurring); SSR-96-7p; *Sanchez v. Barnhart*, 467 F.3d 1081, 1081 (7th Cir. 2006); *Prochawska*, 454 F.3d at 738; *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). These included cleaning, vacuuming, dusting, and shopping for groceries, leaving the house repeatedly to do errands, walking, using public transportation, watching the children, making repairs to his car, and making repairs around the house. (R.15, 109-115). The ALJ found that these activities were not limited to the extent that one would expect given Mr. Suarez's assertions of disabling pain. (R. 15).

Despite Mr. Suarez's suggestion to the contrary (*Reply Memorandum*, at 2), this is not a case like *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), where the court chastised the ALJ for equating the ability to perform a few sporadic household chores with the ability to work eight hours a day for five consecutive days a week. Here, the ALJ discussed Mr. Suarez's daily activities as one facet of his credibility determination. And where the plaintiff in *Carradine* pursued a wide variety of pain treatments – heavy doses of strong drugs such as Vicodin, Toradol, Demerol, morphine, and surgical implantation in her spine of a catheter and a spinal-cord stimulator – Mr. Suarez has sought no treatment for pain, and admitted to Dr. Patil that Tylenol and Advil relieve his claimed headaches. (R. 135).

Finally, it should be noted that the record demonstrated that Mr. Suarez's claimed pain in his hand did not interfere with his daily activities in almost any way, and that the over-the-counter medications enabled him "to have good nights rest." (R. 110-111). The

only thing that was affected by the claimed pain in his left hand was his ability to fix things. But even in this regard, Mr. Suarez said that it had only "somewhat" affected him. (R. 111).

Mr. Suarez also complains that the ALJ was prohibited from considering questionnaires Mr. Suarez completed in connection with his applications for benefits. According to Mr. Suarez, SSR 96-9p – or 96-9 – requires the ALJ to rely on the examination of the claimant at the hearing regarding his daily activities to the exclusion of any document he may have filled out in the course of applying for benefits. (*Reply Memorandum*, at 1-2). The contention is baseless. There is no SSR 96-9, and SSR 96-9p explains SSA policies regarding the impact of an RFC assessment for less than a full range of sedentary work on an individual's ability to do other work.

SSR 96-7p explicitly requires the ALJ to look at statements the claimant made to SSA at each step of the administrative review process. *See Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).[12] If the information submitted in support of an application could not be used, what value would it have? The only purpose to be served by excluding information submitted in support of a claim for benefits would be to encourage inaccuracy in the forms themselves and to encourage deceptive testimony by a claimant free from the basic rule of evidence that prior inconsistent statements may be used to impeach the credibility of a witness.

---

[12] The many interviews and forms required to apply for disability benefits should not be viewed as traps based on slightly varied accounts of daily activities. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ in this case did not do that. What he did do – and what he was required to do – is to review the information contained in the questionnaire. Had he failed to do so, the argument no doubt would be that he had ignored relevant evidence.

Mr. Suarez also complains that the forms, dated July 9, 2003, were too old for the ALJ to have relied upon them in 2005. (*Reply Memorandum*, at 1-2). The argument is curious, to say the least. It is not only unsupported by case law, but Mr. Suarez's counsel relied on the forms at the administrative hearing in his cross-examination of the medical expert. (R. 36-37). And, in any event, the forms were relevant to the period during which Mr. Suarez alleges he was disabled, and were prepared concurrently with his applications for benefits. Mr. Suarez's lawyer did not suggest they were outdated or in need of revision. The ALJ could properly assume that the information was still valid.

The ALJ considered Mr. Suarez's allegations and evaluated them in light of: 1) the objective medical evidence – or lack thereof; 2) Mr. Suarez's course of treatment – or lack thereof; and 3) Mr. Suarez's daily activities. As such, the ALJ considered the factors he was required to, *see* SSR 96-7p; *Prochawska*, 454 F.3d at 738, and provided an adequate explanation of how they affected his credibility determination. *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). To require more from the ALJ, especially in a case where the claimant has done so little to support his claim, would not accord the ALJ's determination the deference which it is due.

**2.**
**The ALJ's Determination That Plaintiff Can Perform His Past Work**
**Is Supported By Substantial Evidence**

Finding Mr. Suarez suffered from (diet-controlled) diabetes, a missing left index fingertip, and mild left ear hearing loss, the ALJ advanced to the third step of the sequential evaluation, which measures the impairments against those recognized as conclusively disabling by the SSA. (R. 16A). As the impairments did not meet the

requirements or equal the level of severity contemplated by any of those listings, the ALJ proceeded to the fourth step and considered the effect of these impairments on the claimant's ability to perform his past relevant work. (R. 16A). Mr. Suarez contends that the ALJ's finding that he was capable of performing his past relevant work as a machine operator is unsupported by substantial evidence. (*Memorandum*, at 8-10).

In considering the ALJ's step four determination, it is important to recall that Mr. Suarez bears the burden of proving he cannot perform his past relevant work. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005); *Scheck*, 357 F.3d at 702. Thus, the threshold and overarching question is whether Mr. Suarez provided any evidence that would suggest he was disabled–that is, that he was "unable to work." *Sanchez v. Barnhart*, 467 F.3d 1081, 1081 (7th Cir. 2006).

He argues that the ALJ failed to specifically list the physical requirements of his past work (*Memorandum*, at 8), but he does not hint at what evidence might demonstrate he was unable to return to that work. The only impairments Mr. Suarez has been able to document with medical evidence are asymptomatic diet-controlled diabetes, a missing left index fingertip, and mild hearing loss in the left ear. His own, two-paragraph summary of the medical record fails to suggest any limitations that would preclude his return to his machine operator job. (*Memorandum*, at 2-3). He worked despite his hand injury for at least one year, and he testified that he would be able to return to that job even now.

Although Mr. Suarez claimed on a form that his headaches would cause him to miss a lot of work, he was also emphatic that had he not been laid off in 2001 he would

be at that job now – where he did the same basic kind of work he had done for various employers since 1984. (R.25-29). When Mr. Suarez's attorney tried to "rehabilitate" him after this admission, Mr. Suarez focused on his left hand. When counsel asked, "so, in other words, you're not disabled?", Mr. Suarez responded, "No, I fractured both my fingers of the left hand and I fractured them in that company." (R. 30). This was inconsistent with his claim that he had fractured his thumb, and Mr. Suarez attributed his alleged disability to the injury of his left hand, not headaches. Vacillating versions of events are a persuasive datum in making credibility determinations. *See, e.g., Ryder Truck Rental v. NLRB*, 401 F.3d 815, 827 (7th Cir.2005); *Bailey v. United States*, 1997 WL 759654 at *35 (Fed.Cl.1997); *United States v. Nixon*, 881 F.2d 1305, 1309 (5th Cir.1989).[13]

Despite Mr. Suarez's explanation of his prior employment, the contention appears to be that the ALJ failed adequately to specify the duties of his machine operator job. Cases such as *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir.1984) and *Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir.1991) require an ALJ to do more than merely describe the demands of a claimant's former job in generic terms such as "sedentary," "light," or "medium." The claimant in *Strittmatter* was a fifty-nine year old woman whose past work as a machine operator involved some sedentary activity. *Id.* at 509. She suffered from cataracts, which required her to wear thick glasses that impaired her

---

[13] The principle is an old one. *See Nervine Co. v. Richmond*, 159 U.S. 293, 302 (1895)("A witness who at different times gives different versions of the same transaction, and blows hot or cold as his interest in the particular litigation may require, can scarcely complain if the court fail to give his testimony the weight to which it would otherwise be entitled.").

peripheral vision, and scoliosis, which limited the range of motion in her neck. The court rejected the ALJ's conclusion that she could return to her past work because (1) her past work was sedentary in nature and (2) she could do some sedentary work. It found the ALJ's logic flawed because "sedentary work is not homogenous with respect to strenuousness." *Id.*

The Seventh Circuit has elaborated on this requirement more recently in *Smith v. Barnhart*, 388 F.3d 251 (7th Cir. 2004):

> The issue is not whether the applicant for benefits can return to the precise job he held, which is hardly likely to have been kept open for him, but whether he can return to a "job" he held that exists at other employers. However, the job must not be described so broadly as to encompass a range of physical and mental abilities some of which the applicant may not have; and that is the case if the job is described merely as "sedentary work."

388 F.3d at 253. Accordingly, the court found reversible error where an ALJ failed to consider whether a claimant could perform the duties of the specific jobs that she had held, and instead merely equated the claimant's past relevant work to sedentary work in general. 388 F.3d at 252.[14]

---

[14] SSR 82-62, which Mr. Suarez references, sets forth a similar requirement:

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> > 1. A finding of fact as to the individual's RFC.
> > 2. A finding of fact as to the physical and mental demands of the past job/occupation.
> > 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

SSR 82-62, 1982 WL 31386, *4. The ALJ made all these findings in the instant case.

That is not what the ALJ did here. The ALJ found that Mr. Suarez could lift up to 50 pounds occasionally and 25 pounds frequently, but was limited in his ability to feel precisely, due to his left finger, and his inability to precisely localize sound. (R. 16, 16A). The ALJ accepted the VE's classification of Mr. Suarez's past work as unskilled and either medium or light, as well as the VE's testimony that an individual with Mr. Suarez's limitations would be able to perform Mr. Suarez's past relevant work. (R. 16, 16A). In addition, the VE explained, when questioned by Mr. Suarez's counsel, that he was assuming that Mr. Suarez's old jobs required him to used both hands. (R. 41). The ALJ accepted this testimony as well. (R. 16). And, the ALJ related Mr. Suarez's own description of the manner in which he operated his machine. (R. 16).

Thus, the ALJ went far beyond a generic description of Mr. Suarez's past work as "medium" or "light." Instead, he actually considered the specific demands of that work and, with the aid of the VE, determined whether Mr. Suarez's RFC allowed him to perform the job. The testimony of a VE constitutes substantial evidence to support an ALJ's decision. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). Mr. Suarez – who has the burden of proof on this issue – has failed to point to any specific requirements related to his past work that are inconsistent with the ALJ's residual functional capacity finding and that he would no longer be able to perform. To require more from the ALJ's opinion, especially in a case where the claimant has done so little to support his claim, would result in "nitpicking" at his opinion rather than in giving it the "commonsensical reading" required. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).

## CONCLUSION

Mr. Suarez seeks DIB and SSI on the basis of a consultative examination arranged by the Agency and treatment notes from three doctor visits prompted by a chest cold. The medical evidence established only that he suffered from asymptomatic diabetes that is controlled by diet alone, a missing left index fingertip, and a slight hearing loss in his left ear.[15] Faced with this record, the ALJ properly found his complaints of disabling pain not credible, and concluded that his RFC allowed him to return to his past relevant work. It was up to Mr. Suarez to provide persuasive evidence on his alleged impairments and prove he was unable to perform his past relevant work *Yuckert*, 482 U.S. at 146 n. 5; *Scheck*, 357 F.3d at 702. In this, he failed badly.

To attempt to shift the burden to the ALJ is contrary to the system Congress and the courts have labored to make work. Administrative Law Judges in the Social Security Administration are in the business of resolving cases, not, to borrow Judge Friendly's phrase, of engaging in "the overarduous performance of bead-games for the applause of the law reviews." Friendly, *On Entering the Path of the Law*, in Benchmarks 31 (1960). "No principle of administrative law or common sense requires [this court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989). Here it could not.

---

[15] Even if one were to credit Mr. Suarez's claims of headaches, those headaches were relieved by Tylenol.

32

The ALJ's decision finding that Mr. Suarez is not disabled is supported by substantial evidence and is affirmed. The Commissioner's motion for summary judgment is GRANTED. The plaintiff's motion for reversal and remand is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 12/6/06